FILED
DAVENPORT, IOWA

# United States Court of Appeals

01 APR -6 PM 12: 05

## FOR THE EIGHTH CIRCUIT

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

No. 00-1634

AUDIO ODYSSEY, LTD.,     *
an Iowa Corporation; DOGAN A.     *
DINCER; ANN M. DINCER     *
    *
    *
Plaintiffs/Appellants,     *
    *    Appeal from the United States
v.     *    District Court for the
    *    Southern District of Iowa.
BRENTON FIRST NATIONAL BANK,*
an Iowa Banking Corporation;     *
MICHAEL M. BLADEL, Sheriff of     *    3-99- CV- 10161
Scott County, Iowa; JOHN M. NORRIS,*
Deputy Sheriff of Scott County, Iowa;     *
CHARLES A. BARTON; JOHN C.     *
BRADLEY; CHRIS A. PIEPER,     *
ROGER HOFFMAN; MERCHANTS     *
BONDING COMPANY, a Corporation, *
CORPORATION,     *
    *
Defendants/Appellees,     *
    *
    *
    *
    *
AUDIO ODYSSEY, LTD., an Iowa     *
Corporation; DOGAN A. DINCER;     *
ANN M. DINCER,     *
    *
Plaintiffs/Appellants,     *
    *
v.     *

```
                                          *
BERNARD J. HOFMANN;                       *
ANDERSON & NELSON, a                      *
Professional Corporation,                 *
                                          *
        Defendants/Appellees.             *
```

Submitted:  January 10, 2001

Filed:  April 6, 2001

Before LOKEN and BYE, Circuit Judges and SACHS[1], District Judge.

SACHS, District Judge.

In mid-July 1995, Brenton First National Bank obtained a writ of replevin for seizure of certain property of Audio Odyssey, Ltd., an electronics store in Davenport, Iowa.  A sheriff's deputy executed the writ later that day, ordered a locksmith to change the locks at the store, and posted "No Trespassing" signs even though the writ called for the seizure of personal, rather than real, property.  Audio Odyssey's president and sole shareholder, Dogan A. Dincer, could not (or did not) enter the premises for several weeks, and the store went out of business.  Seeking redress for the writ's ex parte issuance and mishandled execution, Audio Odyssey, Dincer, and Dincer's wife brought a variety of claims under 42 U.S.C. § 1983 and state law against the Bank, the Bank's attorney and law firm, the Bank's bonding company, the county officials who aided the writ's execution, and a loan officer of the Small Business Administration.  Plaintiffs now appeal from the district court's many adverse rulings.  These include the dismissal

---

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation.

of the Dincers' individual claims for lack of standing, the dismissal of the section 1983 claim against the SBA loan officer, and the grant of summary judgment to other defendants on all federal claims. We affirm in part, reverse in part, and remand for further proceedings.

I

We view the record in the light most favorable to plaintiffs. Dogan Dincer, previously an employee and minority shareholder of Audio Odyssey, purchased the business for $270,000 in 1991. The purchase was partially financed through a $200,000 loan from the Bank, and the SBA guaranteed 85 percent of the loan. Audio Odyssey, in turn, executed a "Business Security Agreement" giving the Bank a security interest in the store's accounts, general intangibles, contract rights, instruments, chattel paper, documents, inventory, machinery, equipment and fixtures. The Agreement required Audio Odyssey to perform its payment obligations under the note, and to take other steps such as maintaining insurance on the collateral and keeping current with all tax obligations. In the event of default, the Agreement allowed the Bank to accelerate the loan and to enter the store and take the collateral.

In the weeks preceding July 14, 1995, Bank personnel came to believe that Audio Odyssey was failing to perform its duties under the loan and Agreement, including the duty to make timely payments, to maintain insurance, and to pay taxes. On July 13, 1995, Dincer paid $6,983 to the Bank, and instructed the teller to apply the payment so as to satisfy the store's monthly obligation for June and July. The Bank instead applied the payment to a previous overdraft. The next morning, John C. Bradley, a commercial loan officer and vice president at the Bank, hand-delivered a letter to Dincer stating that the Bank was accelerating the loan, and demanding payment of the remaining balance (some $127,000) within ten minutes. Dincer contacted his attorney and surmised that he could not raise the sum in such a short time. The attorney faxed a letter to the Bank at around noon, contending that Audio Odyssey was not in default.

The Bank was not persuaded, and it brought an ex parte replevin action later that afternoon. Attorney Bernard Hofmann filed a Petition in Replevin in the Iowa District Court for Scott County, contending, among other things, that (i) Audio Odyssey was delinquent in its loan payments and other obligations, (ii) the Bank was entitled to possession of the collateral under the Agreement, and (iii) immediate action was necessary because the collateral might be destroyed, concealed, moved, sold, or fraudulently transferred (Bank personnel had told Hofmann that an "annual sale" was scheduled for that weekend, and the petition was filed on a Friday). Along with the petition, Hofmann filed a "Bond for Replevin" in the amount of $300,000, or more than twice the value of the collateral. The judge asked Hofmann whether the state's replevin statute required notice to the defendant, and Hofmann advised that the court had discretion to give such "notice and opportunity for hearing as it may prescribe" under Iowa Code § 643.5. Hofmann also explained that the Bank's collateral was in danger of being sold. The judge reviewed the statutory framework, considered the matter very briefly, and signed the order that Hofmann had drafted. Pursuant to the order, the clerk of the court issued a writ of replevin directing the sheriff to deliver the following property to the Bank's possession:

> All inventory, fixtures, accounts, furniture, equipment and machinery on property described as follows:
>
>> 4500 square feet located at 1718 E. Kimberly Road, Davenport, Iowa, legally described as: Part of the Northwest Quarter of the Southwest Quarter of Section 18, Township 78, Range 4, East of the 5th P.M. . . . to the City of Davenport, Scott County, Iowa.

Armed with the writ and order, Hofmann visited the Scott County Sheriff's Department and requested that the writ be served immediately. Sergeant Charles A. Barton reviewed the writ and asked Hofmann if the Bank was prepared with moving trucks to remove the collateral, as is customary. Hofmann said that the Bank did not have moving trucks immediately available. Sergeant Barton explained that the Department could not serve the writ because it was already late in the afternoon and

the Bank did not have moving trucks. Hofmann called Bradley at the Bank for instructions, and Bradley told him that the Bank's intention was to change the locks and keep Dincer and other store personnel off the premises. Hofmann relayed this information to Sergeant Barton, insisted that the writ be executed that afternoon, and asked whether the Sheriff's Department could lock the premises over the weekend to prevent Audio Odyssey from selling the collateral. Sergeant Barton, in turn, reviewed the writ and said that it would be possible to lock the store. At Sergeant Barton's request, Hofmann completed a form entitled "Directions to Sheriff,"[2] which stated that Bradley and a locksmith would meet the deputies at Audio Odyssey.

Deputy John M. Norris served the writ of replevin at Audio Odyssey at 4 p.m. He met Bradley and the locksmith at the premises, and ordered everyone inside to leave the store. Deputy Norris thereafter directed the locksmith to change the locks, secured the inventory and other collateral, and posted "No Trespassing" signs on the front and back doors. During the next week, Deputy Norris and others completed an inventory of the items described by the writ, removed the items, and turned them over to the Bank (along with keys to the premises).[3]

In the meantime, Dincer tried to regain access to the premises--albeit somewhat circuitously. He called the judge at home the night that Deputy Norris served the writ, and the judge advised him to employ an attorney. Dincer and Audio Odyssey retained their present counsel the next Monday. Meetings on July 26 and August 4 between attorneys for Audio Odyssey and the Bank were unfruitful. On August 2, 1995, plaintiffs' attorney wrote a certified letter to the Scott County Sheriff and demanded the immediate surrender of the premises. The letter went unanswered; it is unclear who may have received and reviewed it. Two days later, Audio Odyssey moved to dismiss

---

[2]Under the Sheriff's Department's policy, a deputy reads the writ of replevin along with the "Directions to Sheriff" in order to understand what the plaintiff wants. If the directions conflict with the order and writ, the court documents control.

[3]None of the parties contends that there were fixtures involved; that is, improvements of value belonging to Audio Odyssey and affixed to the premises.

the replevin action, requested an order directing the sheriff to return the real estate, and filed a jury demand. There was no record of a request for expedited handling, and no evidentiary hearing until August 22, 1995. That hearing was continued and never completed. On August 31, 1995, some six weeks after Deputy Norris executed the writ, a court order allowed Audio Odyssey to enter the premises and remove the "No Trespassing" signs. Dincer elected not to re-open the business, surmising that its goodwill and commercial relationships had been destroyed. Ultimately, the state court did not reach a judgment in the replevin action. It dismissed the case without prejudice at the Bank's urging in September 1999--or more than two years after the federal litigation commenced.

In their lawsuit, plaintiffs essentially alleged that Deputy Norris, Sergeant Barton and the private defendants committed an unreasonable seizure of Audio Odyssey's real property by changing the locks and erecting "No Trespassing" signs without a court order authorizing such measures, and that the defendants deprived, and conspired to deprive, plaintiffs of personal property without due process of law, by use of an unconstitutional replevin statute. The district court dismissed the federal claim against the SBA loan officer, and dismissed the Dincers' claims for lack of standing. It later (i) granted summary judgment to the county officials (among other things, finding no violation of plaintiffs' constitutional rights, and alternatively, granting qualified immunity to the relevant officials), (ii) held that the Iowa replevin statute comported with the requirements of due process, and (iii) rejected the conspiracy claims against the Bank and others, having rejected the underlying claims of constitutional injury. The court dismissed some of the pendent claims on the merits, while dismissing others without prejudice to refiling in state court. It entered a final judgment consolidating the various rulings on January 25, 2000, and plaintiffs timely appealed.

## II

As a threshold matter, we hold that the Dincers lack individual standing to sue defendants for the replevin. It is well established that a shareholder or officer of a corporation cannot recover for legal injuries suffered by the corporation. See Heart of

America Grain Inspection Serv., Inc. v. Missouri Dep't of Agric., 123 F.3d 1098, 1102 (8th Cir. 1997); Chance Mgmt., Inc. v. South Dakota, 97 F.3d 1107, 1115-16 (8th Cir. 1996). The rule applies even to a corporation's sole shareholder. See Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel, 20 F.3d 1311, 1317 (4th Cir. 1994). Here, it was Audio Odyssey whose premises and personal property were taken, rightfully or not. Any constitutional violations presented by this case were visited upon Audio Odyssey, and any injuries to the Dincers occurred solely because of their relationship with Audio Odyssey.

It is true that the "shareholder standing rule" does not apply when the alleged injury is distinct from that suffered by the corporation or other shareholders. See, e.g., Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1318 (9th Cir. 1989). The Dincers seek redress for various emotional and reputational injuries stemming from the replevin of the Bank's collateral and the seizure of the premises, including the loss of business relationships with customers and suppliers. We do not think these injuries are "distinct" from the corporation's. A "distinct" injury is one in which the *claimant's* rights have been violated, not merely one in which the claimant is indirectly harmed because of one party's injury to another. See, e.g., Gersman v. Group Health Ass'n, 725 F. Supp. 573, 577-78 (D.D.C. 1989) (holding that a Jewish president and principal shareholder of company could not maintain suit under 42 U.S.C. § 1981 against insurer charged with discriminatorily terminating contract with company), aff'd in relevant part, 931 F.2d 1565, 1567 (D.C. Cir. 1991), vacated on other grounds, 502 U.S. 1068 (1992). The premises and replevined items belonged to the corporation, not the Dincers. Doubtless a sole shareholder may suffer shame and humiliation when the corporation is destroyed, but an "emotional injury" exception would swallow the rule against shareholder standing. The district court correctly dismissed the individual claims.

## III

We also agree with the district court's grant of summary judgment on the federal claims regarding Audio Odyssey's personal property. Audio Odyssey maintains that

the Iowa replevin statute, Iowa Code §§ 643.1 - 643.22 (1999), is unconstitutional because it deprives debtors of property without due process of law. As best we can surmise, Audio Odyssey challenges the statute facially and as applied by the defendants and the state court. We reject both challenges.

## A

A number of Supreme Court cases have examined whether various state property seizure schemes comport with due process. In Fuentes v. Shevin, 407 U.S. 67 (1972), for example, the Court invalidated Florida and Pennsylvania statutes that permitted an ex parte replevin upon bare conclusory allegations by the creditor and the creditor's posting of a bond, allowed the clerk of court to issue the writ without meaningful judicial oversight, and permitted the defendant to regain its property only by posting a bond or, in Pennsylvania, by initiating a separate lawsuit. See id. at 73-78. Fuentes held that in the absence of "extraordinary situations," a debtor could not be deprived of a significant property interest unless provided with notice and a pre-deprivation opportunity to contest the creditor's claim. Id. at 90. The Court refined and perhaps narrowed this holding two years later. See Mitchell v. W. T. Grant Co., 416 U.S. 600 (1974). Mitchell upheld a Louisiana sequestration statute that did not provide for prior notice to the debtor and a prior hearing, in light of other procedural safeguards that, on balance, satisfied due process and permissibly accommodated the competing property interests of debtors and creditors. See id. at 608-10. Specifically, the Louisiana statute required a factually detailed affidavit explaining the debtor's delinquency, the posting of a bond, an immediate post-deprivation hearing, and judicial supervision of the entire process; the debtor could regain the property by posting a bond, and the creditor remained potentially liable for wrongful attachment. See id.

The Court invalidated a Georgia garnishment statute the next year. See North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601 (1975). The statute in question allowed a writ of garnishment to issue by a court clerk without judicial participation in the process and upon a conclusory affidavit; the statute did not provide for a prompt

hearing, and the debtor could not challenge the garnishment without posting a bond. See id. at 606-08.

On the basis of Fuentes and subsequent authorities, our Court attempted to distill "five primary factors" that must be evaluated in considering a replevin or attachment scheme's constitutionality in the absence of prior notice and a pre-deprivation hearing. Watertown Equip. Co. v. Norwest Bank Watertown, N.A., 830 F.2d 1487, 1491 (8th Cir. 1987).[4]  These include:

> (1) an affidavit accompanying the petition for the writ of attachment which contains facts alleged by a person with knowledge; (2) an opportunity for the debtor to dissolve the writ by posting a bond; (3) an "early" post-deprivation hearing at which the creditor bears the burden of proving the legality of the writ of attachment; (4) indemnification of the debtor for a wrongful attachment; and (5) judicial supervision of the attachment process.

Id.; see also Lewis Service Center v. Mack Financial Corp., 696 F.2d 66, 68 (8th Cir. 1982).  As Watertown noted, however, there is no easy formula to follow, because due process requirements are not "technical," and the creditor remedy scheme must be evaluated "as a whole."  830 F.2d at 1490 (quoting Mitchell).[5]


## B

---

[4]We believe the Watertown elements remain sound despite Connecticut v. Doehr, 501 U.S. 1 (1991), and United States v. James Daniel Good Real Property, 510 U.S. 43 (1993), at least in the personal property context, and when, as here, the dispute is between a creditor and debtor rather than a plaintiff and defendant in tort.  See Doehr, 501 U.S. at 17 ("[D]isputes between debtors and creditors more readily lend themselves to accurate ex parte assessments of the merits. Tort actions, like the assault and battery claim at issue here, do not.").

[5]Watertown turned on gross deficiencies in the fourth and fifth factors listed above.

We believe that Iowa's statute satisfies the <u>Watertown</u> evaluation.  First, the statute adequately (perhaps generously) indemnifies the debtor in the event of a wrongful taking.  Section 643.7 requires the creditor to post a bond of at least "twice the value of the property sought to be taken."  Iowa Code § 643.7.  The aggrieved debtor may seek a judgment on the creditor's bond, or request that a jury "assess the value of the property and the damages for the taking or detention thereof."[6]  <u>See</u> Iowa Code §§ 643.16, 643.17, 643.20.  By contrast, the defective statute in <u>Watertown</u> limited the creditor's bond to $10,000, while the property seized was worth over $275,000.  <u>See Watertown</u>, 830 F.2d at 1494.  Damages were unavailable under the statute or common law absent a showing of malice or lack of probable cause.  <u>See id.</u> Iowa's replevin statute differs from the one we invalidated in <u>Watertown</u> in that it protects the debtor against losses from wrongful replevins that may be reasonably foreseeable.  The damages to Audio Odyssey could conceivably exceed the bond, but that hardly relates to the <u>ex parte</u> nature of the proceeding.  In any event, it is Iowa replevin practice in general that is in question here, not the more bizarre circumstances and events surrounding the *execution* of this particular writ of replevin.

Second, the debtor may routinely regain the taken property by posting a bond of its own.  <u>See</u> Iowa Code § 643.12.  Audio Odyssey insists that such a right terminates once the officer transfers the property to the creditor.  Even so, the collateral in this case was not transferred to the Bank until some five days after Deputy Norris executed the writ.  We conclude that a counter-bond could have been timely posted even under Audio Odyssey's reading of the statute.[7]

---

[6]Such damages may exceed the value of the property.  <u>See</u> <u>Universal C.I.T. Credit Corp. v. Jones</u>, 227 N.W.2d 473, 479-80 (Iowa 1975); <u>see also</u> Iowa Code § 643.17 (stating that judgment "shall also award such damages to either party as the party may be entitled to for the illegal detention [of the property]").

[7]We confess some skepticism about the financial ability of Audio Odyssey to post a large bond, but theoretical ability is all that <u>Watertown</u> contemplates.

Third, the statute provides adequate judicial supervision of the replevin process. A clerk may issue a writ of replevin only "upon direction of the court after notice and opportunity for such hearing as [the court] may prescribe." Iowa Code § 643.5. The replevin suit is governed by "ordinary proceedings" and presumptively ends in a judgment that one party or the other is entitled to possess the property in question, with or without an award of damages. Iowa Code §§ 643.2, 643.17. These features distinguish Iowa's statute from the ones stricken in Watertown and Fuentes, which permitted a clerk to issue a writ on his or her own. See Watertown, 830 F.2d at 1492; Fuentes, 407 U.S. at 74.

Fourth, we discount Audio Odyssey's argument that the statute makes no allowance for a prompt post-deprivation hearing. Iowa Code § 643.2 provides that a replevin action shall be tried "by ordinary proceedings." We agree with the defendants and the district court that the term "ordinary proceedings" incorporates general motion practice under state law, specifically, Iowa Rule of Civil Procedure 100. We see nothing in the statute to prevent a replevin defendant from filing a post-deprivation motion to dismiss under Rule 100 (or a motion to vacate the writ of replevin) and requesting a very prompt hearing from the court. In this case the judge was immediately available by telephone, and would presumably have been procedurally accommodating if plaintiff had an attorney prepared to deal with the matter.

The statute does specifically preclude defendants from asserting counterclaims and joining "any cause of action not of the same kind." Iowa Code § 643.2. By negative implication, then, it would not preclude a request for a prompt hearing in support of a defense to a replevin suit. Cf. Guzman v. Western State Bank, 516 F.2d 125, 131 (8th Cir. 1975) (invalidating North Dakota attachment scheme, which required debtor to post a bond in order to obtain a post-seizure hearing). Indeed, the state court did permit Audio Odyssey to seek a "post-deprivation hearing" to address whether "the method by which the Replevin Order was and has been enforced was incorrect"-- the very sort of hearing that is now asserted to be statutorily forbidden.

We do not believe that the statutory provision for a prompt hearing must be explicit. See Watertown, 830 F.2d at 1492 ("The South Dakota statute *can be*

-11-

*interpreted* as having provided for an immediate hearing.") (emphasis added).  The Iowa statute does not expressly provide for a hearing, much less a prompt one.  Yet, the statute is no different in this regard from the one upheld by the Supreme Court in Mitchell.[8]  There, the Louisiana statute provided that "The defendant by contradictory motion may obtain the dissolution of a writ of attachment or of sequestration, unless the plaintiff proves the grounds upon which the writ was issued." La. Code Civ. Proc. Art. 3506 (unchanged since 1961).  In upholding the statute, the Supreme Court observed that the debtor "was not left in limbo to await a hearing that might or might not eventually occur [as in Fuentes].  Louisiana law expressly provides for an immediate hearing and dissolution of the writ 'unless the plaintiff proves the grounds upon which the writ was issued.'" Mitchell, 416 U.S. at 618.[9]  Just as a Louisiana creditor must "prove the grounds upon which the writ was issued," Iowa's statute places the burden of proof upon the creditor throughout the proceedings.  See Wilson v. Findley, 275 N.W. 47, 56 (Iowa 1937).

Although the wording of Iowa's procedural plan might well be improved by fine-tuning, the worst that might be said of it is that a particular debtor might fail to persuade a particular judge to hold a prompt hearing, notwithstanding constitutional requirements.  But this possibility does not render the statute invalid *on its face*.  A statute should not be stricken based upon a "worst case" scenario that "may never occur." Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, 512 (1990).  Nor is the statute unconstitutional as applied.  It allows for a prompt post-deprivation

---

[8]See also Watertown, 830 F.2d at 1491 ("Although the statute did not specify when a hearing must occur, its language was, in essence, no different on this point from the Louisiana sequestration statute which in Mitchell, the Supreme Court said provided for an immediate post-deprivation hearing.").

[9]The Court's interpretation of Louisiana's statute is noticeably generous, but we will adhere to "the principle that courts are to adopt constructions of statutes that avoid grave and doubtful constitutional questions." United States v. Rea, 223 F.3d 741, 744 (8th Cir. 2000).

hearing, but Audio Odyssey did not seek one.[10]  Audio Odyssey, then, had a meaningful _opportunity_ to be heard.  See Hroch v. City of Omaha, 4 F.3d 693, 696 (8th Cir. 1993).  Its failure to seize that opportunity is not a denial of due process.  See Marler v. Missouri State Bd. of Optometry, 102 F.3d 1453, 1456-57 (8th Cir. 1996).[11]

Fifth and finally, the Iowa statute sufficiently requires a plaintiff to substantiate the legal basis for obtaining an ex parte replevin, and we conclude that as a practical matter there was constitutionally adequate compliance--the essential message reached the judge.  The Watertown framework speaks of "an affidavit accompanying the petition for the writ of attachment which contains facts alleged by a person with knowledge."  830 F.2d at 1491.  Absent advance notice and a hearing, due process requires that the creditor explain not only the debtor's delinquency, but also the exigent circumstances that justify a summary deprivation.  See Guzman, 516 F.2d at 130 ("In the absence of an assertion in the affidavit that the creditor believes that the property will be concealed, disposed of, or destroyed and the creditor's interest therein lost or defeated, we do not believe that the ex parte issuance of the warrant of attachment is justified. . . . If such an emergency situation does not exist, the creditor's interest in the property probably will not be impaired by a short delay to provide notice and a hearing to the debtor.").

---

[10]The somewhat leisurely activity suggests that Audio Odyssey was already fatally damaged when the sale was stopped -- if not before -- but that remains subject to proof on remand.

[11]It could even be argued that Audio Odyssey waived its due process attack by not timely resorting to the available procedures that it now claims are inadequate--even if its attorneys did not realize that an immediate hearing could be requested and provided.  See Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 904-05 (8th Cir. 2000) (holding that plaintiff waived claim that termination violated due process, where plaintiff (a) forewent administrative remedies held by the court to be available under state law, and (b) "could have ascertained the applicability [of state administrative law] from a reading of the statutes and pertinent cases"); Hroch, 4 F.3d at 696 (holding that party waived argument against adequacy of pre-deprivation remedies that he forewent).

We discern no infirmity in the Iowa statute as written. Iowa Code § 643.1 requires a verified petition (functionally equivalent to an affidavit), specifying "[t]he facts constituting the plaintiff's right to the present possession thereof, and the extent of the plaintiff's interest in the property." At the very least, this language would require a creditor to specify the nature and extent of the debt owing, the nature of any delinquency, and the extent of the creditor's security interest. Cf. Fuentes, 407 U.S. at 74 ("Florida law automatically relies on the bare assertion of the party seeking the writ that he is entitled to one . . ."). The statute does not expressly require the creditor to specify the exigent circumstances justifying an ex parte proceeding, but that is not fatal. For one thing, the statute could readily be so construed. Exigency would be among "the facts constituting the plaintiff's right to the present possession," given the defendant's due process right to continued possession in the absence of exigent circumstances. See Guzman, 516 F.2d at 130. For another, the court has discretion to provide advance notice and a hearing when the circumstances are *not* exigent. See Iowa Code § 643.5 (providing that writ may issue "upon direction of the court after notice and opportunity for such hearing as it may prescribe"). It appears from the record that the state court judge in this case considered doing just that, then relented after the Bank's attorney explained the danger that the collateral would be sold. The statute, then, is not facially unconstitutional on this basis.[12]

Nor are we greatly troubled by the replevin petition in this case. The Bank offered considerably more than a "bare assertion," see Fuentes, 407 U.S. at 74, that it was entitled to the collateral. The petition described and attached the note of $200,000 that Audio Odyssey had executed, explained Audio Odyssey's obligations under the note, described and attached the Business Security Agreement and the extent of the Bank's security interest, and, correctly or otherwise, specified various alleged delinquencies including $6,233.63 in monthly installments, failing to insure the

---

[12] "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully[.]" United States v. Salerno, 481 U.S. 739, 745 (1987). Subject to certain exceptions not here relevant, "[T]he challenger must establish that no set of circumstances exists under which the Act would be valid." Id.

collateral, failing to pay state payroll and sales taxes, and failing to provide the Bank with certain business records. Moreover, the petition explained the need for immediate action. Among other things, the Bank alleged that "harm . . . will result from the sale, transfer or assignment of the disputed property to the extent [that] such sale, transfer or assignment is fraudulent or in derogation of the plaintiff's rights in such property." We need not rule that such boilerplate language is adequate by itself, because attorney Hofmann explained to the judge his specific concern that "collateral in which [the Bank] had a security interest in was in danger of being sold with the proceeds not going to satisfy their -- the debts that were owed to them." The Bank knew that Audio Odyssey was planning an "annual sale" the following day, and that much or all of the collateral was in danger of being sold. Hofmann's oral statement adequately apprised the judge of this exigent circumstance.[13]

The only noticeable failing is that the petition was verified by the Bank's attorney rather than "a person with knowledge." See Watertown, 830 F.2d at 1491. This defect alone does not create a viable due process claim. Attorney Hofmann drafted the petition in reliance on what his client told him. There is no indication that a petition executed by a Bank official would have been narrower in scope or otherwise different from Hofmann's, or that such a petition would not have recited the allegations essential to the Bank's replevin claim (the debt, the security interest, the delinquencies, and the exigency). The Bank's books apparently did reflect a deficiency, although plaintiff claims a deposit was misapplied. Without *some* plausible showing that a properly verified petition would have made a difference, we cannot say that its absence violated due process under these particular facts. See id. ("[T]he necessary procedural safeguards in a given case are determined by comparing the extent to which they further the defendant's interest in avoiding a wrongful or arbitrary deprivation of his property with their negative effect upon the interest of the state in providing protective creditor

---

[13]Since the proceedings were ex parte, and the question is whether a creditor has adequately explained to the court why a writ of replevin should issue, the fact that there was an oral showing rather than a written one is not constitutionally significant.

remedies."). More importantly, it must be emphasized that due process does not require any "particular form of procedure." Mitchell, 416 U.S. at 610 (citation omitted). Rather, the question is whether the protections afforded Audio Odyssey (and other replevin defendants in Iowa) are sufficient on balance, i.e., whether the statute "as a whole" constitutionally accommodates the property interests of debtors and creditors. Id. We hold that it does, both in general and in this case. Considering Audio Odyssey's ability to obtain a prompt post-deprivation hearing, its adequate indemnification under the statute, its ability to regain the property by posting its own bond, and the Bank's detailed allegations (albeit through an attorney) that Audio Odyssey was delinquent under the note and was planning to sell the collateral, we are satisfied that any harm occasioned by the improperly verified petition was no more than "slight" in comparison to the statute's "substantial advancement of the state interest in protecting a creditor from a dissipation of collateral." Watertown, 830 F.2d at 1491.

We thus agree with the district court and with a summary statement by the Iowa Supreme Court, sustaining the constitutionality of the replevin statute. See Interfirst Bank of Dallas v. Hanson, 395 N.W.2d 857, 860 (Iowa 1986). We also agree with the district court that due process was observed in the seizure of the personal property in question. It may be, of course, that the Bank had no sound factual and legal basis for seeking replevin, which is a matter we do not decide. That will presumably be litigated in state or federal court in connection with a damage claim on the bond.

We have no need to approve the initial state court decision to issue an ex parte order having the effect of stopping Audio Odyssey's "annual sale." Even if we might suppose that discretion was poorly exercised, and that too much weight may have been given to the assumed risk of the collateral's loss in the event of notice to the debtor, what is involved in this portion of the case is the ordinary risk of judicial error, not a substantial constitutional question of due process.

**IV**

The judicially unauthorized lockout of Audio Odyssey's real property is a more troubling federal question, although perhaps less damaging.[14] We must determine whether there is a triable claim that Sergeant Barton and Deputy Norris committed a constitutionally unreasonable seizure of the real property, whether the officers are entitled to qualified immunity, and whether the Bank and its attorneys conspired with the officers to violate Audio Odyssey's Fourth Amendment rights (and whether *they* might prevail under some notion of "good faith" immunity). For the reasons set forth below, we reverse the grant of summary judgment on these claims.

## A

The Fourth Amendment prohibits unreasonable searches and seizures by law enforcement officers, whether of a person or property. See Garner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996). A "seizure" of property occurs whenever "there is some meaningful interference with an individual's possessory interests in that property." Soldal v. Cook County, 506 U.S. 56, 61 (1992) (citation omitted). We believe the officers seized Audio Odyssey's premises by entering the store, ordering those inside to leave, arranging for the locks to be changed, and erecting "No Trespassing" signs, thereby excluding the company's principals from the store's property. Such an exclusion from one's property, even for a rather brief period, is "meaningful interference" as a matter of law.

Somewhat less obvious is whether the seizure was objectively unreasonable. A seizure of property that is unsupported by a warrant or other court order is presumptively unreasonable within the meaning of the Fourth Amendment. See, e.g., id. at 68-69. The order and writ of replevin relied upon by Sergeant Barton and Deputy Norris did not authorize a seizure of Audio Odyssey's real property. Rather, it directed the officers to seize various enumerated types of personal property located at a specific address. Although the writ and order listed a legal address, they did so only to describe

---

[14]Whether plaintiff's six week exclusion from the empty shell of its store was seriously damaging remains to be determined.

-17-

the location of the items to be seized, specifically, "All inventory, fixtures, accounts, furniture, equipment and machinery *on property described as follows* [followed by legal description]." This language cannot reasonably be read to authorize a seizure of the electronics store--particularly in the context of a writ of replevin, which, time out of mind, has authorized the seizure of personal rather than real property.[15] Presumably an officer may briefly secure real property for minutes or hours while seizing personal property located thereon, in order to maintain the peace or even to prevent customers or employees from absconding with the collateral. Compare Illinois v. McArthur, ___ U.S. ___, 121 S. Ct. 946 (2001) (permitting temporary seizure of homeowner while officers obtained search warrant).[16] But erecting (and failing to remove) "No Trespassing" signs, changing the locks, and giving the keys to the Bank far exceeded the scope of any temporary seizure that might be justified. Defendants do not even argue that the replevin writ and order, fairly construed, conferred a right to seize the real estate for the several days required to conduct an inventory and arrange for the removal of personal property. They do contend, however, that they acted reasonably.

Defendants' reliance upon Johnson v. Outboard Marine Corp., 172 F.3d 531 (8th Cir. 1999), is misplaced. There, we held that an erroneous seizure of personal property is not necessarily an "unreasonable" one, and that the officer in that case had a reasonable basis for seizing a boat and trailer that fell outside of a writ of execution. Johnson did not purport to immunize all errant seizures; rather, the question is whether the officer's mistake is objectively reasonable. See id. at 536-37; Dawkins v. Graham, 50 F.3d 532, 534 (8th Cir. 1995) ("[T]he Fourth Amendment's allowance for officers' honest mistakes is limited to mistakes that are objectively reasonable."). That is the

---

[15]Interestingly, a civil procedure manual kept by the Sheriff's Department defines "replevin" as "the redelivery to the owner the possession of *personal property* which is his and which is wrongfully detained from him and to which he has a right to immediate possession" (emphasis added).

[16]We also assume there is an adequate law enforcement reason for seizing real property for a fairly long time to secure a crime scene, but here we are dealing with a routine civil proceeding.

same question we ask today. Our answer differs from that reached in <u>Johnson</u> because the facts of the two cases stand in sharp contrast. The writ of execution in <u>Johnson</u> authorized the seizure of "any and all personal property of the judgment debtor (a dissolved corporation) located at" the address of the corporation's secretary. While executing the writ, an officer seized a boat and trailer that were later discovered to be the property of the corporation's secretary and president rather than the corporation itself. Various circumstances not here present made the officer's decision reasonable:

--The boat and trailer were not identifiable as property of one entity or another, and were the same sort of property handled by the judgment debtor in the course of its business.

--The officer had been told by a superior that, even if the property were not the corporation's, the secretary of the corporation was not protected under state law from an execution to satisfy a judgment against the corporation. We tacitly accepted that as authorization similar to legal advice.

--The officer confronted the secretary when seizing the boat, and the secretary was unable to produce any documentation of ownership for the boat or trailer.

In short, the officer in <u>Johnson</u> relied upon specific facts creating a reasonable belief that the writ of execution authorized a seizure of the property at issue, while the officers in this case did not. An officer's mere recitation of a mistaken belief does not make the mistake "reasonable" as a matter of law, and we cannot agree that the seizure of Audio Odyssey's real property was "reasonable" under the Fourth Amendment.[17]

**B**

---

[17]As Deputy Norris's superior, Sergeant Barton is potentially liable as a supervisor as well as individually, since he "directly participated in the constitutional violation." <u>Otey v. Marshall</u>, 121 F.3d 1150, 1155 (8th Cir. 1997). We explain in Part V, however, that Sergeant Barton's *supervision* of Deputy Norris is not itself actionable. We also leave open the question of whether Deputy Norris could rely, for some of his conduct, on advice from a superior--as in <u>Johnson</u>.

The more challenging question is whether the officers are entitled to qualified immunity. "In resolving a case in which the defense of qualified immunity has been raised, this Court must determine whether the appellees asserted a violation of a federal right, whether that right was clearly established, and whether a reasonable official in [the defendant's] position would have known that his conduct violated that right." Walden v. Carmack, 156 F.3d 861, 868-69 (8th Cir. 1998). We believe not only that Audio Odyssey has demonstrated a violation of a constitutional right, but that the right in question is well established, namely, the Fourth Amendment's protection against seizure of one's property in the absence of a warrant, an equivalent court order, or circumstances justifying a recognized exception to the warrant requirement. See id. at 872 (upholding denial of qualified immunity, where officer allegedly seized items outside the boundaries of that described in search warrant and did not posit a reasonable belief that the items were located within such boundaries).

Finally, we examine whether a reasonable officer in Sergeant Barton or Deputy Norris's position would have known that the seizure at issue violated the right in question. The tests for Fourth Amendment legality and qualified immunity both use the term "reasonable," but the two questions are distinct. A seizure comports with the Fourth Amendment if it is objectively reasonable; one way for a seizure to be objectively reasonable is for the officer to have a reasonable belief that a court order allows the seizure. See, e.g., Johnson, 172 F.3d at 536-37. Qualified immunity, on the other hand, somewhat expands the leeway already afforded by the substantive Fourth Amendment law. It may not be useful to ask whether an officer's conduct is "reasonably reasonable," but we do examine the conduct more deferentially at the qualified immunity stage. An analogy might be drawn from the standard governing a qualified immunity defense to a charge that an arrest was lacking in probable cause; then, "the issue for immunity purposes is not probable cause in fact but arguable probable cause." Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996).

Whatever measure of deference is due Sergeant Barton and Deputy Norris, it cannot immunize an error as significant as theirs. "Qualified immunity does not protect plain incompetence." Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995) (affirming

denial of qualified immunity to officers who, among other things, erroneously executed a search warrant at 611 Adam Street rather than 611 Byrd Street); Wooley v. City of Baton Rouge, 211 F.3d 913, 926-27 (5th Cir. 2000) (holding that officers who delivered child from mother to grandparents under court order awarding temporary custody to grandparents were not entitled to qualified immunity, where the order did not direct officers to effect a transfer of custody, and state law required a separate civil warrant for such transfers); Bins v. Artison, 721 F. Supp. 1034, 1038 (E.D. Wisc. 1989) (rejecting qualified immunity defense to due process claim and entering judgment for plaintiff, where officer seized plaintiff's racing car when executing judgment against other parties, without ascertaining car's owner), vacated in part on other grounds, Nos. 90-1149, 90-1339, 1991 WL 10625 (7th Cir. Feb. 4, 1991).  The mere inclusion of Audio Odyssey's legal address within a writ and order requiring the seizure of various enumerated items on the premises does not colorably justify a seizure of the premises themselves--even if one ignores the legal distinction between real and personal property, the purpose of a replevin, and the distinct possibility that the officers did not even harbor the claimed reasonable belief on the day in question.[18]  At the very least, a zealous creditor's request for measures clearly exceeding those authorized by the court should have given the officers pause, either to consider their actions more carefully or to seek disinterested legal advice from the county attorneys they regularly consult.  "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate."  Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982).

---

[18]If the officers truly believed that the writ and order allowed the Bank to seize the premises and use them to store the personal property, then it is unclear why moving trucks would be necessary to remove the personal property (and why Sergeant Barton asked attorney Hofmann if the Bank had arranged for such moving trucks).  It is equally likely -- and probably should be assumed on summary judgment -- that the officers correctly understood the writ and order, but were persuaded by Hofmann and the Bank to carry out a seizure beyond the one authorized by the court.

We are aware that certain practical arguments can be asserted in favor of the real estate seizure. As the district judge and the dissent would have it, we also suppose that seizure of the premises may have been the "sensible" thing to do, at least while taking an inventory of the property. But to make this dispositive simply strong-arms away the unquestioned legal right of Audio Odyssey to enjoyment of the empty premises, however that may be valued at trial. It may be equally "sensible" to create a path across the vacant, unused land of another when needed, even though consent has not been given. But the right of expropriation and self-help is clearly limited. There was no reason to doubt that Audio Odyssey's legal right to its property was being invaded without judicial approval, for an indefinite period, and for an unauthorized purpose--be it to store and inventory the collateral, to effectuate the Bank's desire to possess the premises, or otherwise. We therefore reverse the grant of summary judgment to Sergeant Barton and Deputy Norris on the basis of qualified immunity.[19]

## C

A further aspect of the case concerns the length of the wrongful seizure for which the officers and the other defendants are potentially liable. Audio Odyssey contends that the premises were seized for six weeks; Deputy Norris changed the locks and erected "No Trespassing" signs on July 14, 1995, and Dincer did not regain access to the premises until the court's order of August 31, 1995--despite the certified letter sent to the Sheriff's Department and the meetings between attorneys from Audio Odyssey and the Bank, during which demands for the real estate were made. Audio Odyssey contends that defendants are liable for the entirety of the company's exclusion

---

[19]The facts at trial may differ from those we have presented, but any reassessment of qualified immunity will ultimately be a question of law for the court. See Buffkins v. City of Omaha, 922 F.2d 465, 472 n.16 (8th Cir. 1990); Garionis v. Newton, 827 F.2d 306, 309 (8th Cir. 1987) (holding that district court erred by submitting the ultimate issue of qualified immunity to the jury). Qualified immunity is unavailable to the officers on the record before us as we have construed it.

from the premises, as well as the foreseeable consequences of that exclusion--including the store's failure.  Defendants insist that the plaintiffs should have more promptly sought a judicial remedy, and we agree that Audio Odyssey could have gone to court very quickly to seek immediate return of its real estate.  In addition, defendants argue that plaintiffs could have posted a bond to have possession restored, and the record suggests that Audio Odyssey claims to have been financially able to do so.

The issues include whether the defendants proximately caused Audio Odyssey's extended injuries, and beyond that, whether the injuries are more fairly attributable to plaintiff's failure to promptly mitigate damages.  Those are jury questions.  "Causation is generally a jury question unless, in a particular case, the question is so free from doubt as to justify taking it from the jury."  Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir. 1994) (citation and quotation omitted).  The possibility of an intervening cause does not generally defeat an inference of proximate cause as a matter of law.  See Trudeau v. Wyrick, 713 F.2d 1360, 1367 (8th Cir. 1983).  Here, the question of who caused the extended lockout is not free from doubt.[20]

### D

We next consider the responsibility of various private defendants for seizing the real property.  Recovery is available under section 1983 only for violations of federal rights committed by persons acting "under color of state law."  Private conduct is actionable under section 1983 under two conditions.  First, the constitutional deprivation at issue "must be caused by the exercise of some right or privilege created by the State . . ." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982) (describing the right to seek a garnishment or attachment as qualifying).  Second, the private party

---

[20]Because of our reversal on the Fourth Amendment claim, we need not decide whether a brief or extended seizure of the real estate violated Audio Odyssey's right to procedural due process.  On remand, such a claim (if pursued) may depend upon whether the seizure is characterized as "random and unauthorized," or as the result of established state procedures.  See Hudson v. Palmer, 468 U.S. 513, 533 (1984); Coleman v. Watt, 40 F.3d 255, 262 (8th Cir. 1994).

must have "acted together with or . . . obtained significant aid from state officials" or engaged in conduct that is "otherwise chargeable to the State." Id.; Wyatt v. Cole, 504 U.S. 158, 162 (1992). The second element requires more than the private misuse of a state statute (as alleged in the taking of the personal property in this case); a plaintiff must show that the private party acted in concert with or obtained significant aid from state officials who were themselves involved in a constitutional violation. See Hassett v. LeMay Bank & Trust Co., 851 F.2d 1127, 1129-30 (8th Cir. 1988); Apostol v. Landau, 957 F.2d 339, 343 (7th Cir. 1992). Otherwise stated, there must be a "meeting of the minds" or a "mutual understanding" between a private party and public officials to engage in conduct that violates the plaintiff's federal rights. Miller v. Compton, 122 F.3d 1094, 1098 (8th Cir. 1997).

Audio Odyssey has clearly made a sufficient showing to survive summary judgment. A reasonable jury could find a "meeting of the minds" between Bank's loan officer and vice-president Bradley and attorney Hofmann, on one hand, and Sergeant Barton and Deputy Norris, on the other, to seize Audio Odyssey's real estate even though the state court ordered no such thing. Indeed, on the present record, the idea appears to have been Bradley's to begin with.

We are unpersuaded that the Bank, Bradley, and Hofmann are entitled to any sort of immunity. Qualified immunity does not extend to private defendants who conspire with public officials to violate constitutional rights--at least in the replevin context. See Wyatt, 504 U.S. at 168-69. Wyatt reserved the question of whether such private defendants might be entitled "to an affirmative defense based on good faith and/or probable cause[,] or that § 1983 suits against private, rather than governmental parties could require plaintiffs to carry additional burdens." Id. at 169. We have not squarely addressed this question, although other circuits have answered it affirmatively. See, e.g., Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1276 (3d Cir. 1994); Wyatt v. Cole, 994 F.2d 1113, 1118 (5th Cir. 1993); Pinsky v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996). The precise scope of "good faith" immunity accorded by these cases is unclear.

We need not decide whether to recognize such a defense, or define its scope, because doing so would not assist the private defendants. Any immunity that might apply would be no broader than the qualified immunity accorded public officials. See Wyatt, 504 U.S. at 167-69 (discussing rationale of public immunity and of extending it to private parties). Hofmann and the Bank's view of the scope of the court's order is no more reasonable than what is now claimed by Sergeant Barton and Deputy Norris.[21] If Sergeant Barton and Deputy Norris are not entitled to qualified immunity, then those who conspired with them are not entitled to its private sector analogue.

As a separate basis for affirmance, Hofmann and his firm offer an "Assignment of Real Estate Lease and Agreement" signed by Dogan Dincer on behalf of Audio Odyssey. The document purports to assign Audio Odyssey's lease to the Bank, but it is unsigned by the store's landlord (one Frank Brown) or by any representative of the Bank. In the event of default, the Assignment allows the Bank to enter the premises without notice, and "using such force as may be necessary," to remove or sell all collateral. Hofmann argues that the Assignment gave him a reasonable belief that Audio Odyssey consented to the seizure of the real estate, and that changing the locks arguably falls within the Assignment's allowance for "such force as may be necessary" to remove the collateral. The district court did not rule on the Assignment's significance, and the issue is not adequately briefed by the parties. We may affirm a grant of summary judgment on any basis supported by the record, see Wilson v. Spain, 209 F.3d 713, 716 (8th Cir. 2000), but the record is not adequately clear in this instance. The parties are free to urge their positions before the district court--hopefully in greater detail.[22]

---

[21]Although Bradley was not present, and perhaps had no opportunity to study the documents, he had even greater notice that the store itself was not subject to seizure: Sergeant Barton's initial statement that the replevin could not be accomplished without contemporaneous removal of the personal property.

[22]We observe that Fuentes rejected an argument similar to Hofmann's. See 407 U.S. at 95-96.

## V

Audio Odyssey's remaining assignments of error are without merit. First, there is no viable claim under either section 1983 or otherwise against SBA loan officer Roger Hoffman. On behalf of the SBA, Hoffman authorized the Bank to accelerate Audio Odyssey's loan and to seek a replevin. This act alone does not create liability-- regardless of whether Hoffman is alleged to have conspired with the state officials to violate Audio Odyssey's constitutional rights, or whether he is charged with violating them himself as a federal official. The replevin of the personal property was not unconstitutional in the first place. As for the real property, there is no contention that Hoffman had advance knowledge of any scheme to seize Audio Odyssey's premises without court authorization, or that he participated in such a scheme. Accordingly, there was no "mutual understanding" between Roger Hoffman and the other defendants to violate Audio Odyssey's rights. Miller v. Compton, 122 F.3d 1094, 1098 (8th Cir. 1997). At most, Hoffman's decision might have breached the SBA's agreement with Audio Odyssey and the Bank, but that is not a constitutional violation and cannot support a viable claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). See Buford v. Runyon, 160 F.3d 1199, 1203 n.6 (8th Cir. 1998) (stating that Bivens claims lie "for violations of constitutionally protected rights"); Schlock v. Beatrice Production Credit Assoc., 596 F.2d 278, 281 (8th Cir. 1979) (no constitutional violation "when a governmental agency breaches a contract it has entered into in the commercial world").

We also reject the supervisory claims against Scott County Sheriff Michael M. Bladel. The suit against Bladel in his official capacity is a suit against the municipality he serves. See Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 905 (8th Cir. 1999), cert. denied, 528 U.S. 1157 (2000). The County may be liable for unconstitutional acts that implement a county policy or are invoked pursuant to a governmental custom; the custom or policy must be the "moving force" behind the constitutional violation. Patzner v. Burkett, 779 F.2d 1363, 1367 (8th Cir. 1985). Audio Odyssey claims that Bladel did not adequately supervise the officers under him. A failure to train officers may amount to a "policy," but this variety of claim generally

requires the municipality to have prior notice of its officers' misbehavior and to act with deliberate indifference thereafter. See id. Audio Odyssey cites no evidence of previous Fourth Amendment violations committed by Scott County officials that resemble the one committed by Deputy Norris and Sergeant Barton, nor any evidence that the County had notice of such misconduct. Nor was the danger of Deputy Norris's and Sergeant Barton's seizure "so obvious" that a single occurrence will make the County liable for not training its employees to prevent it. See Board of County Comm'rs v. Brown, 520 U.S. 397, 409 (1997); City of Canton v. Harris, 489 U.S. 378, 390 (1989). Finally, Audio Odyssey points to the County's "policy" of allowing private parties to complete a "Directions to Sheriff" form to aid officers in serving and executing writs and orders. This argument misstates the County's policy, which requires the officer to follow the writ or order if it conflicts with the "Directions to Sheriff." For that matter, the "policy" of using "Directions to Sheriff" forms is not itself unconstitutional, as an express policy or affirmative custom must be to create municipal liability. See Patzner, 779 F.2d at 1367.

Equally without merit is the supervisory claim against Sheriff Bladel in his individual capacity. Sheriff Bladel can be liable for Deputy Norris and Sergeant Barton's constitutional violation only if he "directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997) (citation and quotation omitted). The Sheriff did not know about this replevin until he was notified of this lawsuit, and there is no contention that he directly participated in the writ's execution. To be individually liable for failing to train his subordinates, Sheriff Bladel must have "received notice of a pattern of unconstitutional acts committed by subordinates . . ., demonstrated deliberate indifference to or tacit authorization of the offensive acts . . ., [and] failed to take sufficient remedial action"--and the failure must have proximately caused Audio Odyssey's injury. Id. As explained above, there is no showing of previous illegalities that place Sheriff Bladel on the requisite notice. The supervisory claim against him necessarily fails. A similar claim against Sergeant Barton for improperly supervising Deputy Norris fails for the same reason.

## VI

For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.[23]

LOKEN, Circuit Judge, dissenting in part.

As the Court's thorough opinion makes clear, hindsight suggests that all the parties to this July 1995 dispute acted unreasonably. The Bank sought a replevin order it was unprepared to implement and then insisted its borrower's store premises be immediately seized. The County Sheriffs padlocked store premises that were not encompassed by the replevin order without discussing with Audio Odyssey whether less drastic measures would protect the Bank's interest in the replevined collateral. And Audio Odyssey dallied for weeks rather than take prompt legal action to recover the store premises.

In my view, the key to unraveling these events, at least for purposes of Audio Odyssey's § 1983 claims, lies in the breadth of the replevin order -- "All inventory, fixtures, accounts, furniture, equipment and machinery" found on the store premises. The premises were part of a shopping center. Audio Odyssey was a tenant, not the owner, of those commercial premises. Audio Odyssey's only interest in possession of the premises was to operate its retail store. If the store was stripped of all the personal

---

[23]Insofar as there may be individualized matters that are not referred to in this opinion and that the parties have not briefed, such as the liability of defendants Chris A. Pieper and the law firm, Anderson & Nelson, P.C., nothing in this opinion is intended to preempt issues that would otherwise be available for trial--so long as those issues are resolved in a manner consistent with the opinion. In addition, the district court is free to reconsider its dismissal of Audio Odyssey's pendent claims in light of our resolution of the federal claims. Damages from the inability to conduct plaintiff's sale as scheduled cannot, of course, be litigated further except to the extent authorized by state law.

property listed in the court order, it would obviously be inoperable, at least until Audio Odyssey replaced the inventory, fixtures, furniture, equipment, and machinery.

The replevin order gave the Bank the right to immediate possession of all the named personal property. If the order thereby authorized the County Sheriffs to prevent Audio Odyssey from selling the replevied property before the order could be executed -- and the court now agrees that it did -- then Audio Odyssey's right as a tenant to continuing possession of the store premises was of no immediate value. That is why it was reasonable for the Bank as secured creditor to urge that Audio Odyssey's store operations cease until the replevin order could be executed. That is why it was objectively reasonable for Sergeant Barton to review the breadth of the replevin order and conclude that it authorized the County Sheriffs to close the store for a reasonable period of time. And that is why Audio Odyssey made no effort to reaccess the store premises until August, after its debtor-creditor negotiations with the Bank had proven unsuccessful.

The district court thoroughly analyzed the applicable constitutional principles and, mindful of the practical considerations that underlie any Fourth Amendment reasonableness inquiry, concluded that defendants are entitled to summary judgment dismissing all § 1983 claims. Applying its own more selective hindsight, the court reverses in part, thereby casting doubt on the accuracy of the Supreme Court's prediction that, when creditors obtain state court orders before seizing property, the Fourth Amendment "should not foment a wave of new litigation in the federal courts." Soldal v. Cook County, 506 U.S. 56, 72 (1992). In my view, permitting this case to proceed further in federal court is both wrong and regrettable. Accordingly, I respectfully dissent from Part IV of the court's opinion. I would affirm the judgment of the district court.

A true copy.

   Attest:

      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.